**In re J. Sinclair LONG, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 04–BG–883.**

District of Columbia Court of Appeals.

Argued Dec. 20, 2005.
Decided July 20, 2006.

Abraham C. Blitzer, Washington, for respondent.

Traci M. Tait, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before WASHINGTON, Chief Judge, RUIZ, Associate Judge, and STEADMAN, Senior Judge.

PER CURIAM:

The Board on Professional Responsibility has recommended that J. Sinclair Long, a member of the Bar of this court since 1992, be suspended from the practice of law for thirty days.[1] Although Long's pro-

---

1. In addition to the thirty-day suspension, the Board also has recommended that Long be required to attend three hours of continuing legal education courses in legal ethics and professional responsibility. Long does not

fessional legal career was in government service and criminal law, he personally became involved with legal affairs of an aged family friend, Mrs. Lessie T. Lowery, and her relative and caretaker, Mr. Wilbert Harris. In doing so, he had no self-serving intent; his actions reflected his desire to be helpful. The only money Long ever received from either of them was the $75 that Mrs. Lowery paid him to prepare her will.

The Board ruled, and Long concedes, that when he drafted the will for Mrs. Lowery, he incompetently represented her interests and engaged in a conflict of interest without full disclosure to her.[2] On appeal, Long excepts only to the Board's recommended sanction. He contends that the Board misconstrued *In re Boykins,* 748 A.2d 413 (D.C.2000), a case involving similar charges, when it refused to stay the thirty-day suspension in favor of probation, as was done in *Boykins.*[3] We agree with Long that *Boykins* is controlling. Before entering into a discussion of *Boykins,* we set forth, in an abbreviated fashion, the facts of this case.

## I.

Long was admitted to the District of Columbia bar on June 1, 1992. He is also a member of the Bar of the State of Pennsylvania, having been admitted on May 12, 1978. At the time of the hearing, Long was an assistant general counsel at the District of Columbia Department of Consumer and Regulatory Affairs. In the past, he served as counsel for the Fraternal Order of Police, and maintained a crim-

inal law practice. He has no history of disciplinary violations.

At the time of the events at issue, Long had been friends with Wilbert Harris for approximately 25 years. Through Harris, Long became friends with the elderly Mrs. Lowery and her husband. After the passing of Mrs. Lowery's husband, Harris moved into her home and assumed the responsibility of her care. Long had occasion to socialize with Mrs. Lowery when he visited Harris at her home. To Long, it appeared that Harris took appropriate care of Mrs. Lowery and that the two had a good relationship. Long believed that Harris was Mrs. Lowery's sole living relative.

At some point in the spring or summer of 1996, Harris approached Long with a form book in hand, and requested that Long draft a will in which Mrs. Lowery would leave all her assets to Harris. Long agreed to draft the will, despite his having no experience in estate planning. Long edited the form will in an attempt to comply with the requirements of District of Columbia law. He did not seek the advice of other attorneys more experienced with estate planning nor did he perform any legal research on the subject. Long prepared two drafts of the will, the second of which he submitted to Harris for his approval. After correcting a few errors, Long gave the final draft to Harris, instructing him to have Mrs. Lowery sign the will in front of two witnesses.

Sometime before Long produced the final draft of the will, he spoke with Mrs. Lowery at her home. Long remarked that

challenge this portion of the Board's recommendation.

2. In violation of D.C. Rules of Professional Conduct 1.1(a), (b), and 1.7(b)(2), (c). The Board also found that Long had failed to explain in writing the basis for or rate of his fee in violation of Rule 1.5(b).

3. Long also argues that the Board should have accepted the Hearing Committee's proposed sanction of no more than an informal admonition. The Board was justified in rejecting this recommendation.

he understood that she intended to "turn[] over the farm to Mr. Harris." Mrs. Lowery responded, "yes, [h]e's been taking care of me." Long did not become knowledgeable about the existence or identity of Mrs. Lowery's other relatives, he had no specific knowledge of her finances, and he did not discuss her intentions in anything more than this perfunctory manner. He took no special precautions in light of Mrs. Lowery's advanced age and medical condition in anticipation of a challenge to the will. Long charged Mrs. Lowery $75 for preparing her will, which she paid for by a check dated August 15, 1996. Ten days later, Mrs. Lowery signed the will in the presence of two witnesses.

On December 27, 1997, Mrs. Lowery died. Several nieces and nephews contested the will that Long had drafted. The contest ended in a settlement in which Harris received 40% of the estate and Mrs. Lowery's other heirs received 60% of the estate.

During the period of time when the will was being prepared, Long was also assisting Harris in another matter relating to Mrs. Lowery. In February 1996, District of Columbia Adult Protective Services ("APS") received information concerning the possible exploitation and neglect of Mrs. Lowery, who was 87 at the time.[4] APS first visited Mrs. Lowery at Providence Hospital on February 14. Thereafter, APS repeatedly sought to visit Mrs. Lowery at her home.

Perceiving APS's visitation attempts as unwarranted intrusions, Harris enlisted the aid of Long. Long agreed, believing that Mrs. Lowery indeed did not wish to speak with APS staff. Accordingly, Long drafted a power of attorney, executed by Mrs. Lowery, which vested Harris with full authority over Mrs. Lowery's assets. Harris used this power of attorney to preclude APS personnel from entering Mrs. Lowery's home. Eventually, Corporation Counsel, acting on behalf of APS, filed an *ex parte* motion to enjoin Harris from interfering with the APS investigation of Mrs. Lowery. In June 1996, the Superior Court complied with Corporation Counsel's request, finding probable cause to believe that Mrs. Lowery was exploited and in need of protective services. Accordingly, the court ordered Harris to turn over to APS all financial and medical records relating to Mrs. Lowery. Despite this order, and several others, Harris' cooperation was not forthcoming. Long continued to represent Harris during this period, including a contempt proceeding, until December 1996, when Long withdrew as counsel and loaned Harris the money to engage other representation.[5] In April 1997, the Superior Court appointed Barbara L. Smith to be Mrs. Lowery's permanent guardian and conservator based on APS's allegations, and supporting medical evidence, that Mrs. Lowery was incompetent.

## II.

The Hearing Committee recommended that Long be informally admonished for his misconduct. In support of this recommendation, the Hearing Committee noted that the underlying incident represented Long's first ethical violations, there were no aggravating factors, and Long cooperated with Bar Counsel's investigation and acknowledged his misdeeds. The Hearing Committee further noted that Long's mis-

4. There were a number of differing and inconsistent professional assessments of Mrs. Lowery's mental competency in 1996, both before and after Long prepared Mrs. Lowery's will. Based on the Hearing Committee's findings, the Board accepted the fact that Long believed Mrs. Lowery to be competent at the time he drafted the will.

5. There is no indication that Long received a fee in connection with his representation of Harris.

conduct arose from his desire to assist close friends.

The Board, however, rejected the recommended sanction, pointing out that Long had committed multiple violations. Instead, the Board emphasized that "suspensions of varied lengths have been imposed when conflicts of interest are combined with more serious violations, such as dishonesty." The Board found the *Boykins* case to be most analogous to the instant one because Long's conduct did not involve dishonesty and he conceded the conflict of interest and other violations. However, when comparing the facts of *Boykins* with those presented here, the Board concluded that Long's violations were sufficiently more serious in context to preclude the probation granted in *Boykins*.

In *Boykins,* the respondent had never served as counsel for a co-conservator of an estate and had been practicing law for only two years prior to the misconduct.[6] Once serving in that capacity, the respondent conducted some research but not enough to ascertain, for example, the rules regarding payments to counsel or the conflict inherent to representing the estate after representing the prior co-conservator. The Board in *Boykins* observed that his misconduct resulted mainly from negligent preparation, his relative inexperience with the practice of law, and the pressure of managing his own practice. Given these "special circumstances," the Board recommended and this court imposed thirty days suspension, but stayed it in favor of probation. *Boykins, supra,* 748 A.2d at 413–14.

Comparing *Boykins* to this case, the Board first noted the similar circumstances surrounding the subject violations—*i.e.,* lack of preparation resulted in an inability to recognize conflicts and adequately address client needs. As the Board saw it, the similarity stopped there. For the Board observed that unlike Boykins, Long was not an inexperienced attorney but had been practicing law for over twenty years. The Board further observed that Long, as a government employee, was not subject to the special rigor and stress associated with small firm practice when he agreed to draft Mrs. Lowery's will. Therefore, the Board concluded that the special circumstances warranting the stay of suspension in *Boykins* were not present here and declined to stay Long's suspension.

### III.

This court typically adopts the "recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *In re Delate,* 579 A.2d 1177, 1179 (D.C.1990); *see also* D.C. Bar R. XI, § 9(g). Our concern here is that, in our judgment, the Board was mistaken in its analysis of the factors it relied on to differentiate Long's case from *Boykins.*

The Board reasoned that Boykins had deserved leniency because he had been a member of the Bar for only two years prior to the disciplinary proceedings. To us, this factor cuts both ways: while Long certainly cannot claim the status of a newcomer, his record as an attorney remained unblemished for more than twenty years. We have held repeatedly that an attorney's record, or more accurately a lack thereof, may be considered a mitigating factor when fashioning an appropriate sanction. *See, e.g., In re Shay,* 756 A.2d 465, 484, 486 (D.C.2000).[7]

Second, the Board believed that the stress of managing a private practice miti-

---

6. We have expanded our recitation of the *Boykins* facts beyond those that appear in our opinion. The Board, in its Report and Recommendation for this case, set forth a more detailed version of the facts, citing *In re Boykins,* Bar Docket No. 375–96.

7. The Board noted Mr. Long's clean record as a mitigating factor, but not in the context of

gated Boykin's misconduct, and by implication, considered that because Long failed to demonstrate that his misdeeds resulted from similar pressure, he was undeserving of leniency. We interpret the occurrence of Long's violations in a personal context outside his usual practice—assistant general counsel at the Department of Consumer and Regulatory Affairs—to be a mitigating rather than an aggravating factor in the *Boykins* analysis. Unlike Boykins, Long did not hold himself out on a regular professional basis with the requisite expertise over an extended period of time. Long's foray into estate planning represented a one-shot event of a personal nature. Conversely, Boykin's misconduct extended over several months in his regular professional legal practice open to the public and included several separate transactions. On numerous occasions, we have noted that an isolated violation of the Rules may be considered a mitigating factor. *See, e.g., In re Miller,* 553 A.2d 201, 205–06 (D.C.1989); *In re Harrison,* 511 A.2d 16, 19 (D.C.1986). Remembering a primary purpose for the Rules and their enforcement—protecting the public—and given Long's cooperation with Bar Counsel

in this disciplinary proceeding and acknowledgment of his transgressions, we think that the chances for recurrence are minimal.[8]

 We agree with the Board, however, in rejecting the proposed sanction of an informal admonition. An attorney who undertakes to act in a legal capacity, albeit on a personal basis and even if entirely gratis, is not exempt from the ethical rules governing the legal profession. Moreover, incompetent representation and conflicts of interest are significant breaches. Given the *Boykins* precedent,[9] we are satisfied that the purposes of bar discipline will be properly served by imposing a similar sanction on Long.

Accordingly, J. Sinclair Long is hereby suspended from the practice of law for thirty days, stayed in favor of probation on the same term and conditions as set forth in *Boykins,* subject to such modification as may be mutually agreed between Long and Bar Counsel.

*So ordered.*

---

the *Boykins* discussion.

**8.** This is not to say that this consideration would necessarily be determinative. Sanctions are imposed for their deterrent effect on other attorneys as well. *See In re Cater,* 887 A.2d 1, 17 (D.C.2005).

**9.** We are mindful that *Boykins* was an uncontested case. Therefore, *Boykins* may not have

received the full measure of consideration warranting our treatment of it as a binding precedent or one entitled to the usual deference. *See In re Schlemmer,* 840 A.2d 657, 661 (D.C.2004). Nonetheless, we are satisfied that, in the circumstances here, it can be treated as one to which Long's case can be fairly compared.